FILED
CLERK, U.S. DISTRICT COURT

DEC 28 2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rsm _____ DEPUTY

David Williams K-12411
480 Alta Road
San Diago, CA. 92179

UNITED STATES DISTRICT COURT

IN AND FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WILLIAMS AND THOSE WHO ARE SIMILARLY SITUATED,<br><br>                    Plaintiffs,<br><br>       v.<br><br>KATHLEEN ALLISON CDCR SECRETARY, AND FORMER SECRETARY, RALPH DIAZ OF CDCR, IN THEIR OFFICIAL CAPACITIES: JOHN DOE, CCHCS MEDICAL DIRECTOR FOR CDCR: MONA D. HOUSTON, WARDEN AT CIM: R. AMIS, CAPTAIN AT CIM: [ ] BANALES, SERGEANT AT CIM: J. ZAVALA, CORRECTIONAL OFFICER AT CIM,<br><br>In Their Individual and Official Capacities,<br><br>         et al.,<br><br>         Defendants. | **5:22-CV-02277-CJC-JDE**<br><br>CASE No._____<br><br>CLASS ACTION COMPLAINT FOR THE SPREAD AND UNREASABLE DEATHS CAUSED FROM COVID-19 ARISING FROM THE MIDST OF A RETALIATORY AND DANGEROUS ENVIRONMENT FOR DECLARATORY JUDGEMENT: AND FOR GENERAL AND PUNITIVE DAMAGES: MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT<br><br>CLASS ACTION UNDER 42 U.S.C. § 1983<br><br>DEMAND FOR JURY TRIAL |

I CLASS ALLEGATIONS

1. Pursuant to Federal Rules of Civil Procedure, Rule 23(b)(2) and (b)(3), plaintiff must describe how the requirements for a class action are met.

2. Plaintiff brings this action on his own and on behalf of all prisoners that are similarly situated with him (and all prisoners statewide). The class plaintiff represents is composed of all persons who are now, or in the future will be, incarcerated in the CDCR.

3. The persons in this class are so numerous that joinder is impracticable

42 U.S.C. § 1983 Class Action                    Williams et al., v. Allison et al.

1

TABLE OF CONTENTS                                                    PAGE

I CLASS ALLEGATIONS                                                   1

Fed.R.Civ.P, Rule 23(b)(2) and (b)(3)                                2

II JURISDICTION AND VENUE

42 U.S.C. § 1983                                                     2

42 U.S.C. § 12133                                                   2

28 U.S.C. § 1331 and 1343(a)(3)                                    2

28 U.S.C. § 1367                                                   2

28 U.S.C. § 2201                                                   2

28 U.S.C. § 1391(b)(2)

                        III PARTIES

Plaintiff, David Williams                                          2

Defendant, Secretary Ralph Diaz                                    2

Defendant, Secretary Kathleen Allison                              2

John Doe, Medical Director for CCHCS and CDCR                      2

Warden, Mona D. Houston at CIM                                     2

Captain R. Amis at CIM                                             3

Sergeant [ ] Banales at CIM                                        3

Officer J. Zavala at CIM                                           3

            IV EXHAUSTION OF ADMINISTRATIVE REMEDIES

Class Action Appeal Exhibit "D"                                  4, 7

Living Conditions Appeal Exhibit "N"                             5, 17

Plaintiff's Medical Appeal Exhibit "L"                           5, 15

                VI STATEMENT OF THE FACTS

A.    DEFENDANTS KEPT CLASS MEMBERS IN CROWDED DORMATORIES WITH
      SHARED TOILETS, SHOWERS, AND SINKS, ALONGSIDE PEOPLE WITH
      CONFIRMED, ACTIVE CASES OF COVID-19, BECAUSE THERE WAS NO
      ALTERNATIVE OR OTHER AVAILABLE HOUSING FOR ISOLATION            6

B.    DEFENDANTS PLACE CLASS MEMBERS IN HOUSING INFESTED WITH
      MICE, ROACHES, POOR VENTILATION AND NO ELECTRICAL PLUGS
      THAT SUBJECT THEM TO DANGEROUS CONDITIONS DURING MONTHS
      LONG OUTBREAK AT THE CALIFORNIA INSTITUTION FOR MEN             9

C.    INAPPROPRIATE INTRA-INSTITUTIONAL AND PRISON TO PRISON
      TRANSFER OF QUARANTINED INMATES AMID THE COVID-19
      PANDEMIC, CAUSING UNREASONABLE OUTBREAKS AND DEATHS            11

///

///  ///

CONTINUED TABLE:                                                        PAGE

D.          MEDICAL STAFF FAILED TO RESPOND REASONABLY TO
            SUSPECTED COVID-19 CASES AND FAILED TO TEST AND
            ISOLATE A DEADLY VIRUS THAT CAUSES PROLONGED
            INJURY OR PERMANENT DAMAGE TO INTERNAL ORGANS          15

E.       FOR THESE REASONS, CORRECTIONAL PUBLIC HEALTH EXPERTS HAVE
         RECOMMENDED THE RELEASE FROM CUSTODY OF PRISONERS WHO ARE
         MOST VULNERABLE AND FACE GREATER RISK OF DEATH TO COVID-19     17

F.       RETALIATION, THREATS, COERCION, AND INCITING VIOLENCE AGAINST
         THOSE THAT REPORT MISCONDUCT, COMPLAIN, FILE GRIEVANCES, OR
         PREPARE TO REDRESS THEIR RIGHTS IN A COURT OF LAW              18

G.       LAWMAKERS GRILL CALIFORNIA PRISON OFFICIALS ON MISCONDUCT
         REPORTING FAILURES. STORY BY MARIA DINZEO, MARCH 1, 2021
         [C]OURTHOUSE NEWS SERVICE                                     21

                CAUSES OF ACTION FOR A CLASS ACTION                    23

                              COUNT I
                      CRIMINAL NEGLIGENT HOMICIDE
                      EIGHTH AMENDMENT VIOLATION                       23

                              COUNT II
               INAPPROPRIATE TRANSFER OF QUARANTINED PRISONERS
             CRIMINALLY NEGLIGENT HOMICIDE EIGHTH AMENDMENT VIOLATION   24

                             COUNT III
                  DELIBERATE INDIFFERENT TO A DEADLY VIRUS
                      EIGHTH AMENDMENT VIOLATION                       24

                              COUNT IV
                         PERPETUATED TORTURE
                  VIOLATIONS OF THE EIGHTH AMENDMENT                   25

                              COUNT V
                      FAILED COVID-19 RESPONSES
                  VIOLATIONS OF THE EIGHTH AMENDMENT                   25

                              COUNT VI
               ISOLATION: QUARANTINE: EXPOSURE: AND BASIC HUMAN NEEDS
                      EIGHTH AMENDMENT VIOLATIONS                      26

                              COUNT VII
                  VIOLANCE AGAINST A PROTECTIVE RIGHT
                      EIGHTH AMENDMENT VIOLATIONS                      27

                             COUNT VIII
                         DENIAL OF DUE PROCESS
                  FOURTEENTH AMENDMENT VIOLATIONS                      27

///

CONTINUED TABLE:

                                                                        PAGE

                                COUNT IX
         PRISONERS HAVE A RIGHT TO LIFE UNDER THE 14TH AMENDMENT
           FREEDOM FROM ATYPICAL AND PUNITIVE PRISON CONDITIONS          28

                                COUNT X
               RETALIATION AND DENIED PROCESS AND ACCESS
                        FIRST AMENDMENT VIOLATIONS                        29

                          VII PRAYER FOR RELIEF                           29

iii

1 | because the individuals consist of incarcerated people statewide and that the
2 | joinder of all persons is impracticable and the disposition of their claims in
3 | a class action rather than individually will benefit the parties of the Court.

4 |   4. The class includes unnamed, proposed class members who cannot by diffin-
5 | ation be joined. Further, proposed class members are highly unlikely to file
6 | personal appeals or suits, not only because of retaliation, but many are
7 | indigent, and have limited access in retaining qualified Counsel.

8 |   5. The claims of the class share common issues of fact and law, including
9 | but not limited to whether defendants policies regarding health and safety,
10 | hygiene as relevant to COVID-19 pandemic that systemically affect class
11 | members rights that are violated through the Eighth Amendment, and whether
12 | defendants policy regarding the right to due process and redress grievances
13 | in Court violate plaintiff and class members First and Fourteenth Amendments;
14 | And whether defendants actions will require the Court to process one or more
15 | defendants for criminal indictments on Negligent Homicide, or perhaps a lesser
16 | offense of wrongful death, which should be decided by a Jury.

17 |   6. The claims of plaintiff are typical to those of the class as a whole,
18 | because each class member is currently in the custody of the defendants and
19 | plaintiff's claims arise from the same policies and procedures, or lack thereof,
20 | that provide the basis for all class members.

21 |   7. Plaintiffs are adequate class members who meet all the requirements of
22 | Rule 23(b)(2) and (b)(3), containing allegations established the necessary
23 | prerequisities to the maintenance of a class action under these rights. There
24 | is no conflict of interest in this case with other class members. All will
25 | fairly and adequately represent the interest of the class, and each understand
26 | their personal responsibilities as a class representative.

27 |                     II JURISDICTION AND VENUE

28 |   8. This is a Civil Rights action pursuant to 42 U.S.C. § 1983, to redress

---

Class Action 42 U.S.C. § 1983          Williams et al., v. Allison et al.,

1  the deprivations, under color of state law, of rights secured by the United

2  States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. § 1331

3  1343(a)(3), over ADA 42 U.S.C. § 12133, and also supplemental jurisdiction

4  over plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff also

5  'seeks Declaratory judgement pursuant to 28 U.S.C. § 2201. And the Central

6  District of California is the appropriate Venue pursuant to 28 U.S.C.§1391(b)(2)

7  because it is where the events given rise to the claims had occured.

8                                II PARTIES

9     9. Plaintiff, David Williams, is and was at all relevant times herein, a

10  prisoner at the California Institution for Men ("CIM"), serving a 25 to life

11  sentence, and in the custody of the defendants, in CDCR Correctional Facility.

12    10. Defendant, Kathleen Allison, is and was at all relevant times herein,

13  acting under the color of federal and state law, was the undersigned Secretary

14  and appointed Secretary of CDCR October 1, 2020, taken on all former responsi-

15  bilities as Head of CDCR: and is sued in her official capacity.

16    11. Defendant, Ralph Diaz, is and was at all relevant times herein, CDCR

17  Secretary up to Oct. 1, 2020, acting under the color of federal and state law,

18  was head of all operations of prisons statewide; and is sued in his official

19  capacity.

20    12. John Doe, is and was at all relevant times herein, the Head Medical

21  Director of CCHCS for CDCR, and responsible for Medical Employees statewide,

22  and acting under the color of state law, he was the oversight for COVID-19

23  protocols. And is sued in his individual and official capacities.

24    13. Defendant, Mona d. Houston, is amd was at all relevant times herein,

25  Warden at the California Institution for Mem, acting under the color of state

26  and federal law, she is responsible for all daily operations in the prison at

27  CIM, and is responsible for the safety and security of all staff and inmates

28  on her watch. And sued in her individual and official capacities.

---

Class Action 42 U.S.C. § 1983          Williams et al., v. Allison et al.,

14. Defendand R. Amis, is and was at all relevant times herein, Captain at CIM, and while under the color of state law, she is responsible for the safety and security of all staff and inmates under her supervision, and is sued in her individual and official capacities.

15. Defendant, [ ] Banales, is and was at all relevant times herein, a Sergeant at CIM, and while under the color of state law, is responsible for the safety and security of staff and inmates, and is sued in his individual and officials capacities.

16. Defendant, J. Zavala, is and was at all relevant times herein, a CDCR officer, and while under the color of state law, he is responsible for the safety and security of all inmates, and is sued in his individual and official capacities.

IV EXHAUSTION OF ADMINISTRATIVE REMEDIES

17. Concerning the outbreak of COVID-19 and harms caused, a group appeal was filed on May 20, 2020 and signed by 28 class members, which was exhausted on October 17, 2020, with an TIME EXPIRED Decision.

18. It was submitted as an emergency appeal, but CIM failed to respond in the required 48 hours.[1] Upon no further response, it was believed that the appeal was trashed or destroyed, so a second appeal was filed on June 18, 2020 but it too went unanswered; and this time it was sent to Sacramento, which an emergency was detected and ordered CIM to respond.

19. CIM ignored the order and rejected the appeal on July 31, 2020, claimed it bypassed lower levels of review. It was reappealed to Sacramento, where it was exhausted received on August 12, 2020.

20. To ensure due process, a letter was sent to Secretary Ralph Diaz on

1. Title 15 § 3084.9(A)3. says; "The appeals coordinator shall provide an initial response to appellant within 48 hours that shall include whether or not the appeal is being processed as an emergency staff complaint

August 12, 2020, but was redirected to Warden Houston Sept. 15th, indicating
it was being processed for exhaustion. Sacramento did not respond within the
60 day limit, so no answer was given except for TIME EXPIRED October 17, 2020.

21. Plaintiff Williams was the first undersigned on the appeal, because Mr.
Thompson dropped out in fear of retaliation, Williams became the grievance
representative on stated actions.

22. Title 15 § 3084.2.(h)(3) July 1, 2021, says;

> If the inmate or parole submitting the appeal is transferred,
> released, discharged, or request to withdraw from the group
> appeal, responses shall be directed to the next inmate or parolee
> listed on the appeal attachment who remains at the facility/region
> and who shall be responsible for sharing the responses with other
> inmates or parolees identified on the appeal.

23. A second appeal was filed by plaintiff August 17, 2020, on Living
conditions after being denied numerous basic human needs, such as; adequate
food, cleaning supplies and hygiene products, which was also TIME EXPIRED on
October 19, 2020. It includes some staff above and unnamed staff like Zavala.

24. A third appeal was filed by plaintiff on July 20, 2020, concerning
inadequate medical testing for COVID-19 and quarantine, which was denied and
given form responses on both levels, and exhausted on February 11, 2021.

> No longer shall we hide in the dark or be kept silent by those
> that hold us captive, nor our names to be redacted from the
> script, except for CODING, but face those who have threatened,
> intimidated, and used coercion to divide us, while being vicitm-
> ized by a deadly virus and watching others die around us, so we
> rather take a stand and shout from the belly of the beast!

## VI STATEMENT OF THE FACTS

25. After Governor Newsom's declaration for a state of emergency March 4th,
and declaring of a pandemic March 11th, by the World Health Organization (WHO)
CDCR received a Memorandum from several Top Medical Officials and the Health
Care Office outlined the Centers for Disease Control and Prevention ("CDC")
guidance for CDCR. A short version of the memorandum is in Exhibit "A".

26. Also on March 11th, CNBC noted Health Experts citing Dr. Facui, saying the pandemic is 'More Lethal Than Seasonal Flu."[2] (March 11, 2020).

A.    DEFENDANTS KEPT CLASS MEMBERS IN CROWDED DORMATORIES WITH SHARED TOILETS, SHOWERS, AND SINKS, ALONGSIDE PEOPLE WITH CONFIRMED, ACTIVE CASES OF COVID-19, BECAUSE THERE WAS NO ALTERNATIVE OR OTHER AVAILABLE HOUSING FOR ISOLATION

27. There are four facilities at 'CIM'. Facility-A is a level II, with eight (8) dormatory housing units. Facility-B primarily is used for administrative segregation (ad-seg) and the old Reception Center is being converted to a level II, which also consist of celled housing. Facility-C is a level II, with (4) celled housing units. Facility-D is a level I, with ten (10) housing units in use, including eight (8) dormatory and two (2) celled housing units.

28. The first COVID-19 case was on D-Facility March 27th, leading to a very serious outbreak of the virus, causing an immediate program modification, as stated in a Memorandum published April 14, 2020; Exhibit 'B'.

29. On April 22, another inmate tested positive on A-Facility in Mariposa Dorm (called, A5), resulting in continued modified program for A-Facility, as stated in a Memo published May 20, 2020; Exhibit 'C'.

30. After conducting a herd test of Mariposa dorm, '64' inmates were positive for COVID-19, and on May 4th, the positive inmates were moved to the back of the unit for isolation, while the negative inmates remained in the front section on quarantine.

31. Two days later on May 6th, defendants decided to move '5' high risk inmate out of quarantine to Joshua Dorm which was not on quarantine, thus, leading to a peaceful protest going through the chain of command.

2    E.g., Noah Higging-Dunn & Berkeley Lovelace Jr., Top U.S. Official says the coronavirus is Ten Times 'More Lethal Than the Seasonal Fly, CNBC (3/11/20)(citing Dr. Fauci, M.D., Director of the National Institute of Allergy and Infectious Disease), https://www.cnbc.com/2020/03/11/top-health-official-says-coronavirus-is-going-to-get-worse-in-the-us.html.

32. We were worried that the '5' inmates may be infected and spread the virus to the most vulnerable in Joshua Dorm, because they were exposed to inmates positive with COVID-19 for over a week. Both Sgt. Banales and Lt. Vera after being questioned about the consequences by Mr. Williams, they advised us to leave administrative decisions to custody staff.

33. After standing our ground, Captain R. Amis arrive on the scene full of anger and threatening to issue all of us Rule Violation Reports ("RVR"), if we didn't lock it in the building.

34. One class member asked Captain Amis, "Doesn't our health and safety matter? She responded, "I'am not responsible for your health and safety!" See Support Decl. No. 012 at ¶6 [3]

35. Plaintiff Williams now posed the question to Captain Amis, "if someone dies as a result of this move, it may be considered murder!" She responded, "If you don't like it, file a grievance and take us to Court!" After this class members accured the Group Appeal in Exhibit 'D'.[4]

36. The dorms on Facility-A are designed for 80 occupants, and Joshua dorm houses the most vulnerable people of which many have impacting disabilities, who are housed on both sides of the building and share the same dayroom, showers, toilets and sinks, and all occupy the same common areas and touch the same surfaces.

37. Some of the double bunks are not in use to allow social distancing, but are still for those who occupy bunks only three and a half feet apart, as each side of the building have four  (4) rolls of double bunks and with the exception of the unused beds, Joshua Dorm can house up to 112 occupants, which

---

[3] Declarations are filed seperately but in support of plaintiffs class action
    Complaint and are numbered for identification 001, 002, 003 and so forth.
[4] Exhibit 'D' contains the class action appeal signed by 28 class members.

///

1    is approximately 137.5% inmate capacity. See Interior Photos taken by Prison

2    Law Office investigator, Megan Lynch of 'A' and 'D' Facilities at CIM, and of

3    California Medical Facility J-1 dorm in Vacaville. See Exhibit 'E'.

4    38. Dr. Marc Stern, who is widely known as Medical Advisor, Medical Health

5    Expert, and Expert for the U.S. Dept. of Homeland Security, and for preventive

6    measures concerning COVID-19, says, "the level of crowding in California state

7    prisons, as evidence by the population reports, the institutional Bed Audit

8    and photographs I reviewed, is very significant and dangerous from a public

9    health stand point. These crowded conditions, particuulary in the dormatories,

10   make it virtually impossible to maintain physical distancing from others, as

11   recommended by the U.S. Centers for Disease Control and Prevention. Stern Decl.

12   ¶¶ 6-8; Exhibit 'F'.

13   39. Two days following the move of the quarantined inmates, 3 of the 5

14   subsequently tested positive for COVID-19, along with the others from Joshua

15   dorm, as seen in the May 20th Memorandum indicates, were moved back to

16   Mariposa for quarantine.

17   40. Within a matter of days, Joshua dorm inmates begin falling out and on

18   some days it was 2 or more, which doesn't make sense according to the head

19   count kept by CIM staff, beginning with the initial count from may 8, 2020.

20   41. According to a document, CIM's count is, May 8 (1-person), May 19 (1),

21   May 20 (1), May 25 (1), May 26 (1), May 27 (1), May 28 (1), May 29 (2), May 31

22   (1), while the record kept by class members indicate '24' inmates total.

23   42. Furthermore, upon information and belief, internal medical records for

24   those that have returned from isolation, hospitalization, or died are equal to

25   '24' COVID-19 infections during the period between May 8, and May 31, 2020. See

26   Exhibit 'G' Document G-1.

27   43. That same document indicates, there was another outbreak on June 23rd,

28   and instead of isolating the virus, the inmates were left in Joshua dorm

1  alongside those who had tested Negative.

2    44. In a second document in regards to the '23' positive inmates left in

3  Joshua dorm, it says;

4        A Meeting occured with the Chief Executive Officer, Chief Medical
         Executive, and Chief Nurse Executive on June 30th, 2020 and with
5        ADA Coordinator and CAMU CCII On July 1st, and an email from
         Defendants Attorney on July 7th, confirming positive cases are
6        not housed on the same side as persons that are negative... That
         was [found] to be false! Defendants still have not explained
7        ["Why"] the CMO, CME, CNE, ADAC CCII, and Warden [Houston] all
         were unaware, for at least twelve days, that people with con-
8        firmed, active cases were housed on the same side of Joshua dorm
         as people who had not before tested positive?
9  Please see Document G-2 in Exh. 'G'.

10   45. California's crowded prisons house thousands of people who are at high

11 risk for serious health consequences if they are infected with COVID-19. Based

12 on the crowded conditions, coupled with the increaseed concentration of people

13 with high risk complications, including death, from COVID-19, [or from some

14 other virus] which incarcerated people in California state prisons are at

15 extroaordinary risk of dying from COVID-19 or other virus. Stern Decl. ¶¶11-12

16 Exh. 'F'.

17   B.        DEFENDANTS PLACE CLASS MEMBERS IN HOUSING INFESTED WITH
               MICE, ROACHES, POOR VENTILATION AND NO ELECTRICAL PLUGS
18             THAT SUBJECT THEM TO DANGEROUS CONDITIONS DURING MONTHS
               LONG OUTBREAK AT THE CALIFORNIA INSTITUTION FOR MEN
19

20-  46. After CIM discovered the first positive case of COVID-19 on D-Facility

21 March 27th, instead of implimenting the guidence given from medical and health

22 experts ("CDC") on March 11th, defendants seem to shift gears because the had

23 refused to have plans prior to the outbreak.

24   47. Aspects of this are found in a letter sent to Ms. Tamiya Davis, CDCR

25 Office of Legal Affairs ("OLA") June 5, 2020, describing months-long

26 inappropriate housing conditions for COVID-19 patients.

27   48. The first document confirms that after the initial positive COVID-19

28 case on D-Facility March 27th, it had grown to 112 cases within a month,

Class Action 42 U.S.C. § 1983           Williams et al., v. Allison et al.,
                            9

1  resulted in one death. See Exhibit 'H', Doc. H-1.

2   49. The second document indicates a significant program change at the

3  institution. Doc. H-2 says;

4          People, including class members, have been moved to gyms,
           tents on the yard, and newly opened units that defendants
5          previously had closed on the grounds that it could no
           longer safely house people [in] Oak Hall.
6

7   50. Upon information and belief, Oak Hall was condemned because of Black

8  Mold, among other reasons for the health and safety of inmates, as One class

9  member reported being "temporarily housed in Oak [Hall] and that he was trans-

10 ferred out a few days later because of mold". Doc. H-2 at exh.'H'.

11  51. Document H-3 further explains that class members reported frequent

12 movement between housing units and facilities. This is because there are no

13 safe or healthy places at CIM for proper isolation or quarantine, nor is there

14 in general population, due to the prisons infrastructure crumbling, as stated

15 in Document H-3; and H-4 i.e.,

16         CIM has long been plagued with an aging and deteriorating physical
           plant. During our last monitoring tour, the Correctional Plant
17         Manager acknowledged that the [prison] "infrastructure is falling
           apart,' and stated that there is no way he and his current staff
18         can respond to all the repair and maintenance needs at CIM. [That]
           Toilets, showers, and sinks regularly are broken. Doc. H-4
19

20  52. Document H-4 indicates, that these problems are on every facility and

21 in all housing units. Class Members have seen Black Mold hidden behind shower

22 panels and across the celling before it was covered in heavy coats of paint.

23 All of CIM's building, especially the older ones suffer from similar issues.

24  53. Continuing with Doc. H-5 indicate, that Class members placed in

25 isolation or quarantine have complained of electrical cords running across the

26 housing unit floors for a source of power. This was confirmed during a Plata

27 site visit on May 22, 2020; quoting Doc. H-5.

28   "We observed thick electrical cords across the floor in Magnolia

Class Action 42 U.S.C. § 1983          Williams et al., v. Allison et al.,

1    Hall, where class members would walk. We were unable to evaluate
     this problem at Juniper Hall due to Skype connectivity issues in
2    the building."

3    C.    INAPPROPRIATE INTRA-INSTITUTIONAL AND PRISON TO PRISON
           TRANSFER OF QUARANTINED INMATES AMID THE COVID-19
4          PANDEMIC, CAUSING UNREASONABLE OUTBREAKS AND DEATHS.

5    54. Following the first COVID-19 case on A-Facility in Mariposa dorm in

6    late April, Captain Amis provided a list of inmates to be moved from each of

7    the dorms to B-Facility and open bunks for social distancing. cf. at 51 exh.H-3

8    55. They were moved to the old reception center which consisted of celled

9    units with open bars. The units were poorly ventilated and infested with Mice

10   and Roaches. Inmates suffered from lack of showers and cleaning supplies to

11   clean their cells.

12   56. On May 30, 2020, CDCR transferred 121 inmates from quarantine housing

13   at CIM to San Quentin and another 66 to Corcorn, which was approved by the

14   Federal Receiver, J. Clark Kelso, who is CDCR's overseer for the California

15   Correctional Health Care Services ("CCHCS").[5] Inmates deemed high risk and

16   COVID-19 vulnerable.[6] (Warden Houston organized the transfer from CIM).

17   57. On July 1, 2020, Mr. Kelso informed the Senate Committee on Public

18   Safety and blamed CDCR for relying on several weeks-old test when it moved

19   121 CIM inmates to San Quentin,[7] even after experts cautioned that a week-old

20   test is outdated.[8]

21   _____

22   5 Halstead, "San Quentin Overseer" Marin Independent Journal (July 1, 2020)
       https://www.marinjj.com/2020/07/01/san-quentin-coronavirus-outbreak-state-
23     eyes-hospital-overload/
     6 Cassidy,"2020 Chino Prisoners Transferred to San Quentin, Corcorn. Why
24     Wasn't they Tested First? S.F. Chronicle (6/8/20) https://www.sfchronicle
       .com/crime/article/coronavirus-and-prisons-prisoners-went-weeks-15325787.
25   7 Phol, "Horribly botched' Lawmakers Slam California Prisons for 'out-of-
       control' COVID-19 Infections, Sac. Bee (7/1/20) https://www.sacbee.com/
26     news/coronavirus/article243935832.html.
     8 What does a negative coronavirus test really mean? (Maybe not what you
27     think), Advisory Board, July 6th, 2020, https://www.advisory.com/daily-
       briefing/2020/07/06/negative-covid.
28

     Class Action 42 U.S.C. § 1983      Williams et al., v. Allison et al.,
                                    11

58. The transfer was effectuated via crowded buses and some felt sick in route or right after arrival at San Quentin.[9] The CIM arrivals were crowded into enclosed spaces with others for sleeping, showers, and meals.[10]

59. Hundreds of people slept in bunk beds within a few inches of each other in a crowded gymnasium turned dormitory and paired inside 4-by-9 foot cells in other areas. Mr. Kelso admitted 25 transferees were subsequently found to be positive. John Doe, the Top CCHCS Official involved in the transfer decision was removed as the prison system's statewide medical director.[11]

60. On July 3, 2020, the Senate Public Safety Committee Examines COVID-19 in State Prisons. Much of the hearing focused on CDCR's transfer process and testing activities. See Memorandum in Exhibit "I".

61. Assembly member Marc Levine joined the hearing as a Special guest, and in his opening remarks described the state's response to the COVID-19 outbreak at the setting in Marin County, contending that the state's transfer of inmate prisoners who tested positive for COVID-19 into San Quentin the "worst prison health screw-up in state history."

62. Committee Chair, Senator Nancy Skinner referred to the transfer of infected inmates as "abhorrent" and posed the question; "was CDCR mandating the same public protocols that the state asked the rest of us?"

63. Senator Holly Mitchell labeled it a "Canary in the Coal mine."[12]

---

9 Vainshtein, Coronavirus cases have skyrocketed at San Quentin; What you need to know, S.F. Chronicle (6/30/20), https://www.sfchronicle.com/bay area/article/ Coronavirus-cases-have-skyrocketed-at-san-quentin-15374860.

10 Bree Williams, San Quentin Prison was Free of the Virus. One decision Fueled an Outbreak, N.Y. Times (June 30, 2020), https://www.nytimes.com/2020/06/30/us/san-quentin-prison-coronavirus.html.

11 Winton and Christensen, "Top Medical Officer for California prisons ousted amid worsening coronavirus outbreak," Los Angeles Times (July 6, 2020), https://www.latimes.com/california/story/2020-07-06/coronavirus-prisons-inmates-outbreak.

12 The hearing agenda is available here; https://spfs.senate.ca.gov/sites/spfs.senate.ca.gov/hearing_agenda_v3.docx and a video recording of the hearing; https'//www.senate.ca.gov/media/senate-public-safety-committee-20200701/video.

64. On March 2, 2021, The Ella Baker Center for Human Rights published an article/letter describing the Office of the Inspector General's findings in regard to the inmates who were transferred from the California Institution for Men to San Quentin, which states;

- On February 1st, 2021, the Office of the Inspector General ("OIG") released their third report in a COVID-19 series.

- The report outlined how the California Correctional Health Care Services ("CCHCS") and the California Department of Corrections and Rehabilitation ("CDCR") caused a public health disaster at San Quentin Prison when they transferred medically vulnerable incarcerated persons from 'CIM' without taking proper safeguards. One of the most haunting findings established by this report is that CDCR and CCHCS deliber-ately pushed forward the transfer, fully aware of the deadly risk at hand and despite multiple objections and warnings from their own medical staff about the grave risk this created.

- The report notes that the CCHCS executive stated; "The benefit of a more rapid move in this specific situation appears to outweigh the risk." See Exhibit 'J'.

65. Prior to these findings, on July 28, 2020, CDCR and CCHCS Employees filed a grievance with 'SEIU' alleging CDCR's Division of Audit Institutions ("DAI") and the California Correctional Health Care Services violated the contract by requiring employees to work where an immediate and recognizable threat exist to their health and safety.[17]

66. The allegations concerning staff included; Inadequate supply of hand sanitizers and disinfectting wipes, worksite common areas not cleaned through-out the day, inconsistent [wearing] of masks, and no social distancing main-tained in the work-place.

67. The allegation concerning COVID-19 responses; Inadequate testing of staff and inmates, failure to quarantine or isolate suspected exposure, failed internal command and control, and lack of supplies for types of PPE.

---

13 SEIU Local 1000, Employee Contract Grievance (July 28, 2020) https://www.seiu1000.org/sites/main/files/file-attachments/cdcr/cchcs/covid19/grievance.pdf?1596489108.

68. Moreover, recognizing the problem among CDCR and CCHCS employees filing grievance with SEIU or CDCR Division of Audit Institutions ("DAI"), prisoners seem to have it worse addressing similar or same issues since the pandemic begin.

69. Clas Members have voiced their concerns about chemicals, saitizers, tolit paper, proper food preperation, face coverings, testing for COVID-19, which is stated in their declarations. Supportive Decl.s 012 at ¶¶14, 23; 013 at ¶7;  015 at ¶¶10-11; 017 at ¶¶24-26; 018 at ¶10;

70. In November 2020, Prison Law Office ("PLO") voiced their concern about prison Audits, but CDCR claimed, the audits were done and no or very limited problems were identified, and all problems were corrected. The audits were false. Prior record shows this problem still existed in November.

71. Prior record shows that on October 26th, the Office of  Inspector Generals ("OIG") relesed a report on face coverings  ("masks") in CDCR.

- The report found that while masks had been distributed to all, both staff and incarcerated persons frequently failed to wear them as required. The 'OIG' said, that sometimes people did not wear a mask at all and sometimes did not wear mask properly, leaving the nose uncovered, or wearing masks around the neck.

- The OIG also said, prison Supervisors and Managers rearly ever disciplined staff for not wearing masks as required. It also said it was not right for CDCR and prison medical officials in July to say that masks need not be worn outside if people were more than six feet from one another.

72. On October 27th, the CDCR Secretary, Kathleen Allison and the Federal Receiver, J. Clark Kelso issued a memorandum about staff wearing masks. The Disciplinary section of the memo on Doc. 2 states;

- Any Supervisor or Manager who fails to enforce the directives shall be subject to progressive discipline including • Verbal Counseling • Employee Counseling Record (Form 1123) • Letter of Instruction • Adverse Action or Rejection During Probation depending on the employee's tenure.

Please see Exhibit "K" Doc.'s K-1 and K-2.

D.       MEDICAL STAFF FAILED TO RESPOND REASONABLY TO
         SUSPECTED COVID-19 CASES AND FAILED TO TEST AND
         ISOLATE A DEADLY VIRUS THAT CAUSES PROLONGED
         INJURY OR PERMANENT DAMAGE TO INTERNAL ORGANS

73. After the initial May 8, 2020, test for COVID-19, staff failed to conduct additional test to isolate the spread of COVID-19, but allowed it to incubate until June 23rd, when 23 prisoners in Joshua dorm tested positive for the virus, and the greater number of those housed in the building.

74. Medical staff also failed to follow up on those who complained of having symptoms but were denied treatment because their temperature wasn't greater than 101.4 Fehrenheit, while ignoring all other symptoms.

75. It conflicts with the guidence released by the Centers for Disease Con-trole and Prevention ("CDC"), California Department of Public Health ("CDPH"), and California Occupational Safety and Health Administration ("CalOSHA").

76. During a daily temperature check, Plaintiff Williams complained of symptoms; 'cough, fatigue, chills, shaking, and shortness of breath, but staff excused it as regular Flu symptoms because his temperature was no greater than 99.4, and was accounted as dehydration. See Medical appeal Exhibit "L".

- •    COVID-19 is an influenza like illness ("ILI") and be alert to
       clusters of patients with ILI symptoms that test negative for
       influenza or other respiratory pathogens as they could
       represent an out break of COVID-19. Exh.'A'.

77. Plaintiff Williams did not see his Primary Care Provide until October 16th when She evaluated him and prescribed a third Inhaler, Tiotropium ("Spiriva"), as indicated in Medical Records, he developed an increase short-ness of breath, chronic intermittent wheezing and cough with productive phlegm. See Exhibit 'M' Doc.'s

78. Inmate 017 was taken to the clinic May 24th, and although his temperature was 101.9 (exceeding the 101.4), while throwing up with a severe case of chills, which Nursing staff claimed, he was suffering from prolonged

1  dehydration.

2    79. The same person received comment from Officer Smith who stated;"I can't

3  advocate for you, but I have informed Nursing Staff of my observation, and I

4  believe you need to be placed in quarantine. See Decl. 017 at ¶¶5-6.

5    80. The next day, inmate 017 went man-down and was tested positive for

6  the COVID-19 virus, and he was isolated in Berch Hall. Decl. 017 at ¶¶7-8.

7    81. Another class member was not tested until falling down twice and

8  receiving injuries, than tested positive for COVID-19, who spent two months

9  hospitalized without a follow up from CIM Medical. Decl. 010 at ¶¶4-10.

10    82. Plaintiff 013 has been complaining of 'post' COVID-19 damage, but

11  medical staff refuse to evaluate his chest pain, breathing, or intermittent

12  stages of hot skin. Decl. 013 at ¶¶3, 11-12.

13    83. According to medical experts, they are not certain of the outcome of

14  COVID-19 damages, but are competent that this disease has the ability to

15  affect people in numerous ways. e.g.,[14]

16    • "Perhaps the most important observation is that the disease involves
        multiple organs and the majority of the patients show signs of newly
17       presenting diabetes and liver damage irrespective of the severity of
        lung symptoms. Many of the metabolic features that we pick up are
18       not  part of the routine clinical testing and this has immediate
        patient management implications because those morbidities might be
19       occuring under the radar of the current testing paradigms which can
        be quite subtle. These emergent pathologies need to be managed at
20       the same time as the acute respiratory problems to optimize patient
        recovery. What we do know is how presistent these symptoms are or
21       whether they change long term disease risks for recovered patients.
        Detailed follow up studies on recovered patients at the state and
22       national level will be critical to our understanding of long term
        disease risks.

23

24    84. Although the central issue in Plata is adjacent to this proceeding, it

25  is tasked with health care in general, and not whether the current COVID-19

26  ────────────────

27    14. Medical Xpress, Research shows COVID-19 is a Multi-Organ Metabolic
        Disease, August 21, 2020; https://medicalxpress.com/news/2020-08-
28       COVID-19-multi-organ-metabolic-disease.html. accessed August 30, 2020.

infections and threat of future infection jeopardizes the helath and lives of present class members in this case, and after 21 years of facts, and current conditions that are manifesting in CDCR and it's Health Care Systems are still inadequate to prisoners Health, Safety, and Lives.

    E.    FOR THESE REASONS, CORRECTIONAL PUBLIC HEALTH EXPERTS HAVE RECOMMENDED THE RELEASE FROM CUSTODY OF PRISONERS WHO ARE MOST VULNERABLE AND FACE GREATER RISK OF DEATH TO COVID-19

85. Correctional facilities frequently have insufficient medical care for the population and in times of crisis, even medical staff often cease coming to work. Hot Water, Soap, and paper towels are frequently in limited supply. Prisoners, rather than professional cleaners are responsible for cleaning the facilities and often are not given appropriate supplies.

86. This means there are more people who are susceptible to infection all congregated together in a location where fighting the spread of the virus is overall impossible. See Appeal for "Living Conditions" in Exhibit "N".

87. While those at most risk of complications and death from COVID-19 are the elderly and people with underlying serious health conditions, young, healthy people are also at risk of complications and death.[15] Those in thier 30's and 40's who have contracted the disease have had increased number of strokes, leaving them debilitated or dead.[16]

88. Younger, asymptomatic people risk spreading the disease to older and more vulnerable individuals and some who appear asymptomatic at first, later develop serious medical issues at an increased rate.[17] Some studies indicate

---

15 Coronavirus; Young People are not Invincible, 'WHO warns,' BBC News, (March 20, 2020), https:///www.bbc.com/news/world-51982495.
16 Cha, "Young and middle-aged people, barely sick with COVID-19 are dying of strokes," The Washington Post (April 25, 2020), https;//www.washing-tonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/.
17 Couzin-Frankel, "From 'brain fog' to heart damage, COVID-19's Lingering Problems Alarm Scientists,' Science Magazine, (July 31, 2020), https;//www.sciencemag.org/news/2020/07/brain-fog-heart-damage-covid-19-s lingering-problems-alarm-scientists.

---

1   that individuals continue to infect others after "appearent recovery" from

2   the infection.[18]

3     89. Among the 35 prisons, all but four are over 100% capacity, and 19 are

4   at 130% of design capacity, with eight over 150% capacity. Among the four

5   their occupancies are still high from a public health standpoint, [which are]

6   90.9%, 90.2%, 97.7%, 99.3%. Stern Decl. at ¶6-7 in Exh. 'F'.

7     "I further recommend immediate and concerted efforts to downsize the popu-
     lations to the lowest possible at each prison, and particularly those with

8     dormitures... In addition to recommending every effort towards immediate
     downsizing, I also recommend that the [CDCR] begin plainning now to

9     downsize further as conditions change". Stern Decl. at ¶¶14-15.

10    90. Only a few years ago, CDCR decided to solve the prison overcrowding by

11   intergrating 'SNY' (Protective Custody) with Mainline prisoners making housing

12   accomodations simple for prisons statewide. Thus, causing riots, abuse of the

13   elderly and disabled, as enemies were forced to live together, which increased

14   violence, suicide, and death, while others with mental illness suffer from

15   severe cases of 'PTSD'.

16     F.   RETALIATION, THREATS, COERCION, AND INCITING VIOLENCE AGAINST
        THOSE THAT REPORT MISCONDUCT, COMPLAIN, FILE GRIEVANCES, OR

17        PREPARE TO REDRESS THEIR RIGHTS IN A COURT OF LAW.

18    91. CDCR has used numerous tactics of unconstitutional methods to remove

19   or stop appeals from exhaustion, especially those that expose misconduct

20   leading to criminal activity.

21    92. After plaintiff help formulate the grounds in the group appeal, staff

22   tried to hinder it's process, and while in the midst of doing so, plaintiff

23   helped other inmates file grievances on medical care, housing, food preperation

24   clothing exchange, sanitizers, hygiene products, cleaning supplies, and the

25 ─────────────────────────────

26    18 Chang, Mo, Yuan, Tao, et al., Time Kinetics of Viral Clearence and Reso-
      lution of Symptoms in Novel Coronavirus Infection, American Journal of

27      Respiratory and Clinical Care Medicine (March 23, 2020), https;//www.
      atsjournals.org/doi/full/10.1164/rccm.202003-0524LE.

28 ─────────────────────────────

Class Action 42 U.S.C. § 1983           Williams et al., v. Allison et al.,

1    wearing of face coverings.

2       93. Most appeals filed by class members are rejected or not processed. See

3    Inmate Decl.'s O15 at ¶¶10-11; O16 at ¶10; O17 at ¶11; O18 at ¶15; O20 at ¶14;

4       94. On Sept. 9, 2020, after months of being subject to cold watery food,

5    plaintiff Williams advocated against the inadequate food to Officer Tejada,

6    but refused to listen, so plaintiff tossed it on the ground.

7       95. Officer V. Vasquez had taken plaintiff to the program office where Sgt.

        threatened plaintiff Williams. i.e.,

        "I have a group of inmates in Joshua Dorm that tell me everything, and I
        know you are the one generating appeals, and because you have thrown
        food on my officer, your being placed in AD-SEG for assault on staff

        96. However, Officer Tejada refused to engage in false charges against

    plaintiff and therefore, Sgt. Banales released him back to Joshua Dorm.

        97. Another incident occured on Sept. 24, 2020, when Officer Zavala had

    threatened plaintiff Williams over the above incident and later brought six

15  other staff to conduct destructive and illegal searches of several living

16  areas. See supporting letter of Prison Law Office in Exhibit "O" Doc. O-1.

17      98. Personal property, electrical devices, food and clothing were thrown

18  across the floor and destroyed. When they were finished, inmates were told,

19  that inmate Williams was snitching on them and staff Supervisors through the

20  appeals process. Officer Zavala wanted to fight Williams in front of staff and

21  Sgt. Banales, but he refused. See Decl.'s O12 at ¶¶13-17; O13 at ¶¶13-19,21;

22  O15 at ¶¶10-16; O16 at ¶¶3-10; O17 at ¶¶15-17, 20-21; O20 at ¶14;

23      99. Plaintiff Williams' efforts to file his grievance on Officer Zavala

24  was interfered by the defendant and staff who were involved in the Sept. 24,

25  2020 incident, which they had set themselves against plaintiff in a campaign

26  of harassment and several destructive searches of his property. Plaintiff

27  also discovered it was Captain Amis and sometimes Sgt. Banales that retrieved

28  grievances from the locked Appeals Box.

Class Action 42 U.S.C. § 1983          Williams et al., v. Allison et al

                                    19

1      100. In other intergration of 'SNY' and 'Mainline' inmates, the Prison Law

2  Office brought exposure to Richard J. Donovan ("RJD") after filing a Lawsuit

3  on February 28, 2020, as shown in the following document in Exhibit "P".

4                                  DOCUMENT P-1

5  •  After filing a complaint, officers conspired with other incarcerated
      people to assault the person.

6  •  A person was attacked by incarcerated people in retaliation for filing
      a complaint on two officers.

7
   •  After another officer discovered an incarcerated person was speaking to
8     investigators regarding misconduct, the officer had another incarcerated
      person assault the person.

9
   •  For incidents were officers "greenlighted" attacks by incarcerated people
10    on other incarcerated people, i.e., looked the other way while [the]
      attacks occured.

11 •  For incidents where officers permitted or ordered incarcerated person to
      take another incarcerated persons property.

12
   •  Class members have suffered, broken foot, finger, internal bleeding,
13    broken ribs, broken jaw, broken leg, arm, eye socket requiring surgery,
      and bleeding from the ear canal.

14
                                   DOCUMENT P-2

15
   •  Stiches to lip, closed head injury, facial contusion, stiches to chin.
16
   •  Periobital brusing and torn corona.
17
   •  Stabbed with a nail by another incarcerated person at behest of officer.
18 •  Person in Wheelchair's face covered in blood after assaulted by staff.

19 •  Stabbed by another incarcerated person at behest of officer.

20                                 DOCUMENT P-3

21 •  Officer also used the CDCR disciplinary process, called Rule Violation
      Report £"RVR"•, as a form of retaliation, fabricating RVR's against
      people they assault to cover up inappropriate use of force.

22
   •  A Phychologist who reported an officer's excessive use of force that
23    resulted in the officer's dismissal testified... that the officer kicked
      the incarcerated person like he "kicked a soccer ball hard as he could...
24    Yet the officer falsely charged the victim of excessive force with an
      RVR for assaulting the officer.

25
                                   DOCUMENT P-4

26 •  The 'OIG' conducted its own review of CDCR's responses... and found a
      "pervasive lack of timely follow through, including that 'CDCR ignored
27    many allegations, failed to investigate twenty-eight allegations not
      previously known to CDCR, and failed to refer pretinet information to
28    the Office of Internal Affairs ("OIA").

1  • Secretary [Ralph] Diaz sent a response to a draft of the OIG's finding
that did not dispute a single one of OIG's conclusions and instead
2  accused the OIG of improper motives in publizing failures.

3  101. Furthermore, document '4' also says; "the OIG has extensively docu-

4  mented problems with CDCR's investigation system, regarding Salinas Valley

5  State Prison. The OIG reported that the "review of the appeal process revealed

6  a complete failure of the high-level due process goals and that the process

7  appears entirely driven by the purpose to exonerate staff.

8  102. On January 24, 2019, the OIG published a 131 page report on SVSP that

9  simulated patterns of RJD, including several events involving plaintiff and

10  his friend. See Case '8' on pages 83-85 in Exhibit "Q".[19]

11  103. From a more detailed prospective, that reveals intimidation, threats

12  of violence, unprofessional cell searches, confiscating Legal Mail, and

13  planting weapons on class members. See the entirety of Case Eight's Advocacy

14  letter by PLO's Attorneys Margot Mendelson and Rita Lomio dated January 18,

15  2018: in Exhibit "R" (In reference to prolonged facts).

16  G.    LAWMAKERS GRILL CALIFORNIA PRISON OFFICIALS ON MISCONDUCT
REPORTING FAILURES. STORY BY MARIA DINZEO, MARCH 1, 2021,
17       [C]OURTHOUSE NEWS SERVICE

18  104. According to the Courthouse News document, "California prison officials

19  sat before a panel of lawmakers in Sacramento two years ago and promised to

20  overhaul the way prisons handle inmates' complaints on staff misconduct... but

21  delivered a burecuaratic mess instead!" See Exhibit "S".

22  105. The document goes on to reveal that CDCR was given $9.8 Million to

23  start a new staff investigation unit called, the "Allegation Inquiry Manage-

24  ment Section" ("AIMS"), but the money was wastefully spend, and AIMS failed.

25

26  19 OIG Report Jan. 24, 2019. Electronic copies of report published by OIG
are available free in portable document format ("PDF") on our website
27  www.ca.gov. Also for questions concerning the content of this report
please contact Shaun R. Spillance, Public Info. Office 916-225-1131.
28

Class Action 42 U.S.C. § 1983        Williams et al., v. Allison et al.,

106. Assembly Member, Mark Stone had this to say;

- "With all do respect, you have a significant credibility problem on this issue given what we were told two years ago, when we approved the money, and now you're actually asking for more money to provide oversight for a system that was supposed to be oversight."

107. Budget Chair, Phil Ting, grilled Kathleen Allison who took over as Secretary after Ralph Diaz retired on October 1, 2020. She could not speak to her predecessor's intent, nor could she explain why the Wardens were inserted into what was supposed to be an independant process.

108. The Wardens would simply recategorize staff complaints to keep the inquiries in the institution, and in so doing, it exonerated their staff more than 98% of the time.

109. Mr. Ting asked her, "why did the department complicate the process? You been with the department for how many years now? You act like you're a new employee". (She has 34 yrs in CDCR): Also Secretary Allison had this to say;

- "Every allegation will be immediately forwarded to the outside unit. They will no longer go through a screening at the local level... That is the first... correction that needs to be done.

110. Again I had been documenting staff misconduct with the Prison Law Office, and they conducted interviews with the Armstrong class members in Joshua Dorm. Upon asking for a copy of the Advocacy letter, I was told it was too critical and sensitive and revealing; e.g., (See Exhibit "O" Doc. O-2).

- In your letter, you requested a copy of our February 9, 2021 advocacy letter about Joshua Hall. Unfortunately, upon reviewing the letter again, we realized that it contains too much information about other class members, including sensitive information that could identify those members and potentially make them unsafe.

111. The letter go on to say this about R.J. Donovan and prisons statewide.

- On January 28, 2020, we filed a motion in Armstrong v. Newsom seeking a remedial plan to stop correctional officers throughout the California prison system from assaulting and retaliating against people with disabilities. The motion expanded upon a motion filed on February 28, 2020, which described similar harm and sought similar relief for people with disabilities at R.J. Donovan Correctional Facility (RJD) in San Diego, California.

Class Action 42 U.S.C. § 1983        Williams et al., v. Allison et al.,

22

112. After filing a staff complaint on April 25, 2021, Officer V. Vasquez retaliated and moved plaintiff to Cleveland Dorm May 6, 2021. On or about May 19, 2021, I was transferred to California Men's Colony ("CMC"), and when they tried to send me to "SVSP", I ended up in Crisis Bed june 25th, than I went to California Medical Facility ("CMF") on August 11th, and was transferred to R.J. Donovan on March 9, 2022. (About "SVSP" cf. 102-103; Exh.'s "Q" and "R".

113. On September 18, 2022, I was tested positive for COVID-19 ("Omicron") and was housed in C-yard Gym for 10 days. Plaintiff also noted that other inmates quarantined on Echo yard were out wondering among the units without face coverings. See Decl.'s 026 at ¶¶6-7; 027 at ¶¶4,9-10; 029 at ¶¶9-12; etc.

114. Although an outbreak incurred, neither staff nor inmates were wearing masks. Furthermore, Nursing staff was not mandated to do mass testing of the facility, but only on a voluntary basis, causing the virus to spread through-out the institution. See Decl.'s 028 at ¶¶4-7; 030 at ¶¶2-6; 031 at ¶¶4-6;

115. Plaintiff had seen this in other institutions across the state, and had taken necessary measures to collect Inmate Declarations, including from those housed on Echo facility here at R.J. Donovan.

                    CAUSES OF ACTION FOR A CLASS ACTION
 Plaintiff now realleges and incorporates inclusively by reference paragraphs 1-115, which consist of all the above.

                              COUNT I
                    CRIMINAL NEGLIGENT HOMICIDE
                    EIGHTH AMENDMENT VIOLATIONS

116. Near the end of April, 64 inmates tested positive for COVID-19 in Mariposa Hall. On May 6, 2020, staff decided to housed '5' inmates out of quarantine to Joshua Dorm that wasn't on quarantine. cf. 29-31.

117. During a protest, Captain Amis stated; "I'm not responsible for your health and safety!" And further said; "If you don't like it, file a grievance and take us to court!" cf. 34-35. Decl. 012 at ¶6;

1   118. Captain Amis made a conscious decision while disregarding her legal

2   duties and ignoring the consequences, and 14 days later, Warden Houston agreed

3   and placed her signature of approval on the memo dated May 20, 2020. (Exh.'C')

4   119. Defendants knew of the consequences, or should have known, but was

5   deliberate indifferent to the health and safety of others, resulting in a

6   substantial risk of serious harm where death occured. Resulting in Criminally

7   Negligent Homicide and violating the Eighth Amendment.

8                              COUNT II
                INAPPROPRIATE TRANSFER OF QUARANTINED PRISONERS
9           CRIMINALLY NEGLIGENT HOMICIDE EIGHTH AMENDMENT VIOLATION

10  120. On May 30, 2020, Warden Houston from CIM and Top Officials in

11  Sacramento pushed forward a transfer of nearly 200 quarantined inmates to San

12  Quentin and Corcorn. Top Medical official relyed on weeks old test, but found

13  some inmates to be positive after transferring to these facilities. cf. 56-59.

14  121. The Top Medical Officer, John Doe said; "The benefit of a more rapid

15  move in this specific situation appears to outweigh the risk." cf. 64. As of

16  today over 250 inmates died of COVID-19 in CDCR. See Comments at para. 60-63.

17  122. Defendants were aware of the consequences, and should have known to

18  abate the transfer, but were deliberate indifferent to the health and safety

19  of others, and a substantial risk of serious harm where death did occur. Thus

20  resulting in Criminally Negligent Homicide and violating the 8th Amendment.

21                             COUNT III
               DELIBERATE INDIFFERENT TO A DEADLY VIRUS
22                    EIGHTH AMENDMENT VIOLATION

23  123. After discovering on May 8, 2020, that '3' of the '5' inmates sent to

24  Joshua Dorm were COVID-19 positive, staff allowed the virus to incubate and

25  spread for 45 days before testing on June 23rd, when another 23 inmates tested

26  positive. CIM staff failed to follow Health Experts protocols. cf. 39, 62.

27  124. The June 23, 2020, outbreak of 23 inmates, of which none of the CIM

28  Top Officials claimed awareness that Captaim Amis and those under her left the

Class Action 42 U.S.C. § 1983          Williams et al., v. Alloson et al.,

1  23 COVID-19 positive inmates in Joshua Hall. cf. 43-44.

2     125. Captain Amis and those under her supervision knew of the contiguous

3  risk involved, but were deliberate indifferent to the serious medical needs of

4  others, which was harmful to their health and did violate the Eighth Amendment

5                               COUNT IV
                          PERPETUATED TORTURE
6                   VIOLATIONS OF THE EIGHTH AMENDMENT

7     126. Torture is the infliction of physical pain or mental anguish which

8  COVID-19 can produce through degerative health conditions, major organ damage

9  caused by exacerbation, bringing about perpetuated pain and lingering death.

10 cf. 83, and is relevant in several Declarations.

11    127. Several inmates, including plaintiff complained of Post-COVID-19

12 Trauma. e.g., fetigue, shortness of breath, lung exacerbation, chest pain, and

13 intermittent stages of hot skin, that continue to worsen. cf. 76-77, 81-83,

14 and 87-88.

15    128. Early on Medical and Health Experts warned of the consequences caused

16 from COVID-19, and they should have known that their actions could result in

17 irreparable harm or permanent injury, which is cruel and unusal punishment,

18 because they were deliberate indifferent to serious medical needs: Violating

19 the Eighth Amendment.

20                               COUNT V
                        FAILED COVID-19 RESPONSES
21                  VIOLATIONS OF THE EIGHTH AMENDMENT

22    129. After the initial outbreak in Mariposa Hall April 22, 2020, and with

23 Medical approval, Captain Amis and her staff divided the building between the

24 negative and positive inmates, but leaving them housed together to incubate

25 and spread the virus to unwanting inmates. cf. 29-30. See Memo Exh.'C' date

26 concerning May 4, 2020. Also no Mask mandate, failure to test and Isolate.

27    130. After the virus had a substantial time to linger and spread, '3' of

28 of the '5' inmates staff moved to Joshua Hall caused another serious outbreak,

1  and their failure to test for further positive COVID-19 cases, resulted in the

2  deaths of disabled and those with underlying medical conditions. cf. 40-42.

3      131. Not only did Medical and Custody fail to respond to the 23 COVID-19

4  positive inmates left in the building, but failed to respond to those seeking

5  help during an outbreak. cf. 43-44, 76-81.

6      132. Staff failed to make an informed decision, which they knew of the

7  consequences, or should have known, but were deliberate indifferent to the

8  seriousness of these medical needs, and therefore, inmates suffered injury and

9  death, violating the Eighth Amendment.

10                              COUNT VI
              ISOLATION: QUARANTINE: EXPOSURE: AND BASIC HUMAN NEEDS
11                     EIGHTH AMENDMENT VIOLATIONS

12     133. When COVID-19 entered into CDCR prisons, overcrowding was the key

13  ingredient in the rapid spread of the COVID-19 virus, causing the CDCR to

14  inappropriately isolate, quarantine, transfer, and house patients in inhumane

15  conditions, which is cruel and unusual punishment. cf. 30, 36-38, 57-59.

16     134. Both class and proposed class members were moved to temporary housing

17  in tents, gyms, and condemned buildings, exposing them to black mold, broken

18  sinks, toilets, showers, and electrical cords running from building to

19  building. cf. 49-53. As stated in several inmate Declarations.

20     135. Other class members were moved to celled housing units that were

21  infested with Mice and Roaches, which cells were poorly ventilated, causing

22  the virus to spread easily. Inmates' were given a lack of showers and lack

23  of chemicals to clean their cells. cf. 54-55.

24     136. The dorms on A-Facility are designed for 80 occupants, and Joshua Dorm

25  houses the most vulnerable people with impacting disabilities, with a living

26  space of three and a half feet apart, and full to capacity. 137%. cf. 36-38.

27     137. Defendants knew, or should have known, that such living conditions

28  were inhumane, especially for those with impacting disabilities, not only is

1  it cruel and unusual punishment, but deliberate indifferent to a basic human

2  needs, violating the Eighth Amendment.

3                         COUNT VII
                VIOLENCE AGAINST A PROTECTIVE RIGHT
4                  EIGHTH AMENDMENT VIOLATIONS

5      138. The excessive violence seen at 'RJD', 'SVSP', 'CIM' and prisons state-

6  wide not only predate the pandemic, but are systemic patterns of ongoing

7  retaliation used on those who speak to outside agencies, file grievances, and

8  prepare to redress their claims in a Court of law. cf. 91-93, 97-103.

9      139. Prison Officials frequently use inmates to do their dirty work by

10  intentually "setting up" an inmate as a Snitch to be attacked by other inmates

11  as seen in Exh.'O' and 'P'. 100-103.

12     140. The violance is usually focused on the elderly, disabled and the

13  medically volunerable, because they are among those that complain the most

14  about prison conditions and staff misconduct.

15     141. Kathleen Allison is aware of her predecessor, Ralph Diaz accusing the

16  OIG of improper motives in publizing CDCR's failures. cf. at 100-111.

17     142. At no time have defendants responded in a good faith effort to restore

18  or maintain institutional order, but allowed continual retaliation to be used

19  against plaintiff and proposed class members and setting them up as "Snitches"

20  to cause harm or serious injury.

21     143. Defendants knew, or should have known, that their actions were reck-

22  less, and is deliberate indifferent to the safety and security of others, and

23  does violate the Eighth Amendment.

24                         COUNT VIII
                    DENIAL OF DUE PROCESS
25                 FOURTEENTH AMENDMENT VIOLATIONS

26     144. The Secretary of Corrections, Kathleen Allison is aware of CDCR's due

27  process violations which include, appeal rejection, distruction, or failure to

28  process grievances, and is usually followed with abuse and victimization. As

1  seen above. cf. at 93, 98-100.

2    145. Secretary Ralph Diaz claimed the OIG was making public CDCR's failures

3  because the OIG reported CDCR's appeal process is a complete failure of the

4  high-level due process goals. cf. at 100, 104-106.

5    146. Assembly Member, Mark Stone said, Secretary Allison has a credibility

6  problem, and that the appeals never make it to the unit ("AIMS"). And the

7  money funded was wastefully spent. See Courthouse News Service in Exh.'S'.

8    147. Defendants are aware of the numerous due process violations, and are

9  not responding in a good faith to restore order to the appeal system, but

10 continue to allow prisoners rights to be violated, resulting from CDCR's

11 unconstitutional actions, causing irreparable harm and injury to the 14th

12 Amendment.

13                          COUNT IX
                PRISONERS HAVE A RIGHT TO LIFE UNDER THE 14TH AMENDMENT
14              FREEDOM FROM ATYPICAL AND PUNITIVE PRISON CONDITIONS

15   148. Prisoners have a constitutional right to be free from punitive

16 conditions of confinement. Overcrowding has exacerbated the spread of COVID-19,

17 which also create unsanitary living conditions, while placing both negative

18 and positive inmates in the same housing units, coupled with the fact, that

19 neither staff or inmates are properly wearing mask. Comp. at ¶¶71-72.

20   149. Overcrowding has created inhumane living conditions before and after

21 the outbreaks. Staff have placed disabled and Medically vulnerable inmates in

22 condemned buildings, with mice and roach infestation, black mold, broken rest-

23 room and shower facilities, poor ventilation, and denying them cleaning  and

24 hygiene products, are atypical and significant hardship.

25   150. Therefore, these conditions combined create a liberty interest, which

26 defendants have taken without due process, resulting in irreparable damage and

27 loss of life ending in permanent injury, in violation of the Fourteenth

28 Amendment to the United States Constitution.

        Class Action 42 U.S.C. § 1983        Williams et al., v. Allison et al.,

COUNT X
RETALIATION AND DENIED PROCESS AND ACCESS
FIRST AMENDMENT VIOLATION

151. On September 24, 2020, Officer Zavala begin a campaign of harassment against plaintiff Williams soon after Warden Houston discovered the group appeal filed against her, Captain Amis and Sergeant Banales, as shown in a letter in Exh. 'D', which knowledge she gained on September 15, 2020.

152. Staff not only conducted several inmate property searches and accessed plaintiff of being a snitch, but used all forms of threats, intimidation, and coercion against plaintiff and proposed class members, causing some to give up their appeal rights.

153. Plaintiff Williams tried every avenue to file a complaint on officer Zavala, but was strategically hindered and blocked from getting any appeals through after the one for living conditions, causing irreparable damage which resulted in an injury.

154. Class Members have filed several grievances and ADA request for reasonable accomodations, but were rejected, lost or not processed at all. This may affirm the fact that Captain Amis and Sgt. Banales, the same people which are being filed on, have complete control over collecting grievances from the appeals Box.

155. The numerous forms of retaliation has had a chilling effect on ADA and proposed class members to the point of giving up their rights in fear of being victims of retaliation, harm or injuried, causing irreparable damage resulting in injury to their First Amendment Rights.

VII PRAYER FOR RELIEF

(a)  Plaintiff is requesting Class Certification under Rule 23(b)(2) and (b)(3).

The significant number for a class action is '40'. Included here are 33 Declarations, which there are another '19' out of the '28' that signed the group appeal in Exh.'D', bringing the total to '52'. And there are numerous proposed class members statewide.

Class Action 42 U.S.C. § 1983                    Williams et al., v. Allison et al.,

29

(b) Plaintiff is also requesting Class Counsel, because he along cannot represent a class that extends across the state.
Plaintiff's Class will require Counsel to gather and interview appropriate witnesses such as, Medical Experts, Staff, reports, evidence not available or accessable to plaintiff or class members, which information is extremely difficult to extract.

(c) Plaintiff is including a DEMAND FOR JURY TRIAL under Rule 38, because the issues are complex, including the allegations of criminally negligent homicide, or lesser offence.

(d) Family members of the victims that lost their lives should be compensated, as decided by a Jury. Which would require a compensation fund, including those with prolonged suffering, and others not yet identified.

(e) Plaintiff should be compensated for his exposure and prolonged damage to his lungs, which resulted from COVID-19 twice (May 8, 2020 and Sept. 18, 2022), and compensation for long periods of retaliation.

(f) The awards should include general and punitive damages for all the Constitutional Violations.

All of the above should be included and decided by a Jury, and whatever else the Jury find to be Right and Proper.


Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed  on December 2~, 2022 at Richard J. Donovan Correctional Facility in San Diego, California.


David Williams K-12411
R.J. Donovan Corr. Fac.
480 Alta Road
San Diego, CA. 92179

Class Action 42 U.S.C. § 1983          Williams et al., v. Allison et al.,

DAVID WILLIAMS K-12411
RICHARD J. DONOVAN CORRECTIONAL FACILITY
480 ALTA ROAD
SAN DIEGO, CALIFORNIA 92179


TO. Pro Se Clerk,

      This is the third of '3' packages containing the copies of the original.

      I also included a copy of the Proceed without Payment forms. Please inform me that you received all three packages.

                      Thank You;

                        Sincerely,

                        DAVID WILLIAMS

Ps. There are Colored Seperaters between the Complaint, Memorandum of Law, Exhibits and the Inmate Declaration Package.



David R. Williams #2411
R.J.D. Correctional Facility
480 Alta Road
San Diego, CA 92179

3 OF

LEGAL MAIL

X-RAYED
CSO CSD

DEC 2 8 2022

ATT: PRO SE CLERK

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
312 NORTH SPRING STREET, ROOM G-8
LOS ANGELES, CA. 90012

Hasler
12/27/2022
US POSTAGE
$10.20
ZIP 92179
011D11646136

